310 P.2d 812

Elmer CASGER, Employee, Claimant-Respondent,

v.

C. E. FUGER, Employer, and Liberty National Insurance Company, Surety, Defendants-Appellants.

No. 8538.

Supreme Court of Idaho.

May 1, 1957.

Ferebauer & Petersen, Idaho Falls, for respondent.

Glenn A. Coughlan, Boise, for appellants.

58

KEETON, Chief Justice.

Respondent Elmer Casger, hereinafter referred to as claimant, while employed as a carpenter in covered employment, suffered injuries due to a fall from a scaffolding, on June 4, 1953.' The injuries consisted of two broken ribs, occipital scalp wound, sublaxation of a vertebra and probable internal injuries. He was hospitalized from June 5 to June 18, received outside treatment from June 18 to July 13, and was then released by the attending physician. He was thereafter treated by another physician from July 17 to September 21, 1953, on which last date he was released for light work. He was paid total temporary disability compensation for 15 weeks and 3 days. Thereafter, claimant, because

of physical incapacity, did no work in remunerative employment until the summer of 1954, during which season he worked eight weeks caring for the boats of a lodge and earned $241.70. He was then offered employment as a carpenter, but was unable to work as such due to injuries of June 4, 1953. In the spring of 1955 he obtained further medical treatment, including hospitalization which ended June 18, 1955. After this he worked for a period of six weeks in potato processing for Bellville Mfg. Co. and earned $440.90.

On June 22, 1956, he filed with the Industrial Accident Board a petition for hearing, alleging in substance that as a result of the injuries sustained, certain physical impairments and disabilities had developed, and he should be awarded compensation to which he was entitled, and furnished with reasonable and proper medical care and treatment. In an answer appellants deny certain allegations and allege claimant had fully recovered from the injuries of June 4, 1953, and that any disability then suffered was the result of pre-existing conditions not in anywise caused by the accident and injury complained of. Subsequent to the filing of the petition, appellants paid claimant for 38 weeks total temporary disability.

On issues joined and hearing had the Board found that claimant had received a personal injury caused by the accident of June 4, 1953, which resulted in total and

potentially permanent disability, and entered an award that he be paid compensation for 400 weeks, and thereafter a weekly compensation of $12 to run from June 11, 1953, to September 21, 1953, and from April 28, 1955, excepting the six weeks when claimant was employed by Bellville Mfg. Co. The Board allowed a credit on the award of 53 weeks and 3 days already paid. From the award so entered, the employer and surety appealed.

In assignments of error appellants contend there is no substantial competent evidence to sustain the award; that the findings of fact do not support the award made; that neurotic symptoms found by the Board to exist were not the result of the accident; that the award was prematurely made in that claimant was still under medical care and was not surgically healed at the time of the hearing.

Eight doctors who had examined or treated claimant testified. Dr. Jerome K. Burton, an orthopedic surgeon, examined claimant February 28, 1956, and testified that he had restricted motion in his neck, inability to balance his left leg, mild atrophy of the left trapezius (shoulder muscle); that he became dizzy when he moved quickly and gave the cause of headaches complained of by claimant as due to an injury to the cervical spine and interference with the nerve supply, and that such restricted neck motion was intensified by exertion; that claimant showed a loss of balance;

that claimant had traumatic neurosis, and evident loss of libido due to an atrophy of the right testicle; also that any exertion not carefully performed makes claimant dizzy and he falls to one side. When asked what immediate relief could be given claimant for his headaches, the doctor advised a course of physiotherapy to relieve the pressure in the cervical area; further he stated he did not know whether an even balance on both legs could be restored.

He was again examined by Dr. Burton in June, 1956, who found no change in claimant's condition and expressed the opinion that he was totally disabled at the time of the examination and would be permanently so unless considerable improvement could be made in his physical condition.

Dr. E. J. Kiefer, a neurologic surgeon, examined claimant July 6, 1956, and testified the symptoms of pain in the back of claimant's neck and head are aggravated by any head movements; that claimant had diminished sensation over the occipital on the left side; that his neck motions were limited due to pain and discomfort and limited in all directions. In summary, he said:

"My impression was he may have a cervical nerve root injury on the left, involving C–1 and C–2, and I put in C–3 sometimes—it could be C–3, as well, and I recommend the patient be hospitalized for a period of time where nerve blocks can be obtained of the

three suspicious nerve roots, being C-1, C-2 and C-3 on the left. We know exactly which nerve can be injected. If he gets relief from the novocain, it was my recommendation we section the posterior roots of the upper three nerves to relieve the pain of which he was complaining."

The doctor testified claimant refused to accept the treatment recommended.

When asked would physiotherapy be of any help the doctor answered:

"I am a little skeptical about physiotherapy at this point. This happened three years ago, and if the pain has persisted to this date, I am afraid there is injury to the nerve root. He doesn't know whether it was a true whiplash, and that is understandable in a fall like he had. I don't think many of us would remember whether we were whipped around or not. He does give a complaint in ways which would establish a whiplash injury to the neck."

The doctor further testified that exertion would aggravate claimant's condition.

Dr. John S. McMillin examined claimant May 14, 1955, found that claimant's disability has become progressively worse over the past two years; that claimant has pain in his neck; that his neck motion produces pain at about the third cervical vertebra and stabbing pain in the genetalia, and claimant has a slight productive arthritis in the lower area of the spine.

When asked to estimate claimant's disability, he expressed the opinion:

"Well, according to his symptoms, I would think at the time I saw him, anyway, he was completely disabled for any type of work."

Also:

"Q. Do you feel that Mr. Casger is a permanent total disability * * * ? A. No, I would think that with medication and treatment he should be able to perform at least light work and things like some sort of a watchman's job, or a desk job or something that wouldn't require a lot of strain on his neck and back, * * *. He might have some discomfort, but certainly there are plenty of people working and making a good use of themselves every day who don't feel one-hundred percent."

When asked to recommend treatment, the doctor expressed the opinion that claimant's major disability was a disease of his bones and that future treatment should be prescribed by an orthopedic specialist.

Dr. John Hatch treated claimant from July 17, 1953, to September 21, 1953, and examined him again May 11, 1955, and from time to time thereafter. He testified that on the last examination claimant had a subluxation of the cervical spine and some arthritic changes; found some motor weakness on the left side, loss of strength in the left arm, and testified that he had

some organic changes which could have been the result of his accident; also found that at times claimant would become extremely excited and require a sedative. When asked to express an opinion as to the extent of claimant's disability, the doctor answered:

"I would say at the present time, or as of the last time I saw him, in January, if his condition remains static he would be almost completely disabled because he has that condition. However, in my observation, it wasn't constant. If it should remain in the same category as he was in, in the extreme periods, he would be unable to maintain a job. He would maintain a job for periods of time, but again this situation would come on and he would be unable to maintain the job. He would go out and work and he would say that he was moving a board and got a recurrence of his vertigo and felt dizzy and he couldn't carry on with his work. He seemed to react to this unfortunate financial circumstance as a result of this with a good deal—I thought it was more than normal intensity."

The doctor recommended that claimant consult a competent psychiatrist and take the treatment that such psychiatrist would recommend. The doctor also testified with qualifications that at the time of his examination claimant was *100% disabled.*

Dr. L. Stanley Sell, an orthopedic surgeon, testified that he examined claimant on July 23, 1956, and found claimant had some disc degeneration, some limitation of motion in his neck and a partial sublaxation of the third cervical vertebra due to the disc degeneration and summarized his conclusions as follows:

"My conclusions, briefly, were that the patient had had a long period of intensive conservative medical care and I was of the opinion that there was very little I could do, at least as far as any conservative treatment was concerned. In view of his multiple complaints, which were related to the central nervous system, I recommended he be examined by a neurologist, or neuro-surgeon."

and thought claimant could be helped by competent psychotherapy, and rejected the recommendation that claimant submit to a nerve resection, as suggested by Dr. Kiefer; also testified that at the time of the hearing claimant was totally disabled and expressed the opinion that the disability could be reduced by treatment.

Dr. Waid who had first treated claimant testified that he had been immediately hospitalized after the accident, had fractured ribs, was unable to breathe and move around because of the pain in his chest, and headaches; that claimant had complained of abdominal pains and apparently had some inflammation of the lining of the stomach.

Dr. David S. Burnet, a specialist in psychiatry, treated claimant on and subsequent to the 29th of August, 1956; found an anxiety reaction caused by the accident; expressed the opinion that claimant could not work a full day's work of any sort requiring physical or mental exertion and expressed the opinion that at the time of the hearing claimant was totally and permanently disabled.

Claimant testified to the accident, the resulting disability and that he had been unable to work as a carpenter or do other work which required exertion from the time of the accident; that a quick motion of his neck or head caused the feeling of nausea and pain; that severe headaches resulted from exertion or stooping; that he was unable to sleep normally; that he was sexually impotent since the accident, and experiences a severe drawing feeling of his sex organs when lifting and under other conditions. His testimony was corroborated by his wife.

We make the above extensive summary of the testimony because of appellants' contention there was no competent substantial evidence to support the findings of the Board.

■ We find little material conflict in the evidence and no testimony that would support the conclusion that claimant's disability was due to pre-existing causes. Prior to the accident and injury complained of, claimant was a strong, able-bodied man; employed for a number of years as a skilled carpenter. Subsequently he has been unable to consistently follow or engage in any remunerative employment or perform the duties of a carpenter. He is no longer available on the labor market. All reasonable avenues of employment are closed to him.

In Endicott v. Potlatch Forests, 69 Idaho 450, 208 P.2d 803, this Court held:

"A claimant need not be absolutely helpless or entirely unable to do anything worthy of compensation, or from which gain might be derived, in order to be suffering from 'total and permanent disability' within meaning of the compensation act, and if he is so disabled that substantially all avenues of gainful employment are reasonably closed to him, he is suffering from total and permanent disability."

For some other authorities supporting the above conclusion, see: Crawford v. Nielson, 78 Idaho 526, 307 P.2d 229; Kuhnle v. Department of Labor & Industries, 12 Wash.2d 191, 120 P.2d 1003; Lipe v. Bradbury, 49 N.M. 4, 154 P.2d 1000.

■ We believe the above definition of total and permanent disability applicable to claimant; that the conclusions of the Board are supported by competent, substantial evidence, and, under the well recognized rule, when so supported such findings will

not be disturbed on appeal. Swan v. Williamson, 74 Idaho 32, 257 P.2d 552, and cases therein cited.

 The contention that the award was prematurely made and that appellants were not given an opportunity to furnish claimant medical or surgical treatment to alleviate his condition is not sustainable. Claimant was examined by no less than nine doctors, eight of whom testified at the hearing. From the time of the accident, June 4, 1953, to the conclusion of the hearing by the Board, November 15, 1956, more than three years and five months had elapsed, during which time no treatment administered improved claimant's physical condition. Doctors who treated and examined claimant did not agree on any medical services that could or would improve or lessen claimant's disability found to exist; six of the doctors expressed an opinion that at the time of the treatment given or examination made, claimant was totally disabled.

Should there be a change for the better in claimant's physical condition the Board should re-examine the matter and modify the award as conditions may warrant.

The order appealed from is affirmed.

PORTER, TAYLOR, and McQUADE, JJ., and BROWN, D. J., concur.

SMITH, J., not participating.