# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 50485-2023

ROBERT NELSON, )
)
   Claimant-Appellant, )
)
v. )
)
STATE OF IDAHO, INDUSTRIAL SPECIAL )
INDEMNITY FUND, )
)
   Respondent, )
)
and )
)
HOPPY ENTERPRISE, LLC, Employer; and )
IDAHO STATE INSURANCE FUND, )
)
   Defendants. )
)

Caldwell, May 2024 Term

Opinion filed: August 6, 2024

Melanie Gagnepain, Clerk

Appeal from the Idaho Industrial Commission.

The decision of the Commission is <u>affirmed</u>.

Curtis, Porter & Adams, PLLC, Idaho Falls, for Appellant. Andrew A. Adams argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Anthony M. Valdez argued.

---

ZAHN, Justice.

Robert Nelson appeals the Idaho Industrial Commission's decision denying his claim against the Idaho Industrial Special Indemnity Fund ("ISIF") for total and permanent disability benefits. The Commission denied Nelson's claim after concluding that Nelson failed to prove that he was totally and permanently disabled and that he suffered a permanent impairment because of his work-related accident. Underpinning these decisions was the Commission's determination that Nelson was not a credible witness. On appeal, Nelson argues that the Commission's finding that he was not credible is unsupported by substantial and competent evidence and, therefore, its

decision denying his claim should be vacated and remanded for further proceedings. We affirm the Commission's decision because its finding that Nelson is not totally and permanently disabled is supported by substantial and competent evidence.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Nelson's work-related back injury and related medical treatment

On March 29, 2018, Nelson was working for his then-employer, Dependable Auto Sales, when he bent down to lift a garage door and felt a pop in his back. Although Nelson had not thought anything of it at the time, he awoke the next day with significant back pain that radiated down his left leg. Nelson's primary care physician, Dr. Dallas Rindfleisch, performed an x-ray that revealed multilevel degenerative disease in Nelson's lumbar spine without spondylolysis or spondylolisthesis. Dr. Rindfleisch diagnosed Nelson with "acute back pain with left radiculopathy." Dr. Rindfleisch then took Nelson off work temporarily. Nelson filed a worker's compensation claim on April 11, 2018.

Over the next several months, Nelson underwent diagnostic testing and pain-relief treatment with Dr. Rindfleisch. An April 2018 MRI revealed degeneration at Nelson's L5-S1 joint, including moderate thecal sac stenosis secondary to epidural fat and moderate facet spondylosis. Nelson weighed over 350 pounds at the time of this MRI. Dr. Rindfleisch opined that Nelson lifting the garage door at work likely caused a flare up of arthritis and a possible disc bulge in his back. Dr. Rindfleisch subsequently recommended significant weight loss. Dr. Rindfleisch briefly approved Nelson for light-duty work four hours per day before taking Nelson back off work "until further notice." Nelson never returned to work.

In August 2018, Nelson's employer hired Dr. Dennis Chong to provide an independent medical evaluation ("IME"). In Dr. Chong's IME report, he opined that Nelson's back problems were caused by his morbid obesity and were not industrially related. Dr. Chong concluded that Nelson's back pain was likely due to shifting epidural fat related to Nelson's restlessness while sleeping. Dr. Chong opined that Nelson suffered, at most, a mild lumbar strain or sprain from lifting the garage door that would have resolved within a few weeks. Dr. Chong opined that Nelson was medically stable and, as it related to a possible industrial injury, Nelson could return to work without restrictions.

In late August 2018, Dr. Rindfleisch referred Nelson to Dr. Brent Greenwald. Dr. Greenwald diagnosed Nelson with sacroiliitis and epidural lipomatosis. Consistent with Dr.

2

Chong's IME, Dr. Greenwald noted that the lipomatosis was not acute and that Nelson's back problems were related to his weight and a preexisting degenerative condition. In a responsive letter, Dr. Rindfleisch agreed that Nelson's weight contributed to his back issues but noted that Nelson carried that weight prior to his back injury. Dr. Chong authored an addendum to his IME responding to Dr. Rindfleisch's letter and Dr. Greenwald's medical report. Dr. Chong reconfirmed his opinion that Nelson's back injury was not industrially related.

In January 2019, Nelson requested and obtained an IME from Dr. Benjamin Blair. During the evaluation, Nelson reported for the first time that he noticed mild discomfort immediately after he felt the pop in his back on March 29, 2018. Dr. Blair opined that Nelson suffered from an aggravation of preexisting, asymptomatic, lumbar spine stenosis due to lipomatosis and deemed him medically stable. Dr. Blair concluded that the March 29, 2018, injury caused a permanent impairment, assigned an 11% permanent partial impairment ("PPI") for Nelson's back injury, and imposed lifting, motion, and position restrictions. Nelson returned to Dr. Rindfleisch with persistent symptoms in March 2019, and Dr. Rindfleisch continued ongoing injections in Nelson's spine.

In May 2019, Nelson underwent electrodiagnostic testing with Dr. David Simon. Dr. Simon found acute denervation in Nelson's L5 nerve root and diagnosed him with left L5 radiculopathy and ordered a second MRI. The second MRI revealed moderate facet spondylosis throughout Nelson's lumbar spine and a disc protrusion at L5-S1. Dr. Simon referred Nelson to Dr. Brandon Kelly for a spine surgery consultation, but Nelson elected not to have surgery.

In July 2020, Dr. Chong provided a second addendum to his IME. Dr. Chong again opined that Nelson's back issues were not related to the March 29, 2018, injury. Dr. Chong noted that the second MRI revealed a new injury—an L5-S1 disc protrusion—without an intervening traumatic event, which was consistent with the natural progression of the chronic degenerative process.

Nelson underwent weight loss surgery on October 21, 2020. At his heaviest, Nelson weighed 390 pounds. Nelson weighed 269 pounds at his final weight loss surgery follow-up appointment on April 21, 2021.

**B. Nelson's preexisting injuries**

Nelson has sustained several injuries throughout his life that he claims, when combined with the March 29, 2018, work-related back injury, render him totally and permanently disabled. Nelson's relevant preexisting medical history is as follows:

3

- In 1988, Nelson injured his left knee at work and underwent knee surgery. Dr. Rheim Jones determined that Nelson suffered an 8% lower extremity PPI. Nelson experienced complications during his recovery and had to undergo a second surgery after which Dr. Jones increased Nelson's lower extremity PPI to 10% and imposed permanent restrictions of no frequent bending and no lifting more than 50 pounds. However, Dr. Jones removed these restrictions after learning that Nelson was playing baseball.

- In September 1991, Nelson sought treatment for a work-related right knee injury. Nelson underwent right knee surgery, and Dr. Rheim Jones assigned a 7% lower extremity PPI related to his right knee.

- In February 1993, Nelson tore ligaments in his ankle while playing basketball.

- In January 1996, Nelson injured his shoulder at work. Dr. Rheim Jones recommended surgery for a likely torn rotator cuff.

- In December 2004, Nelson underwent surgery again on his left knee to repair a torn ACL.

- Prior to June 2009, Nelson began receiving treatment for osteoarthritis. The record does not indicate the exact date these treatments began.

- In 2009, Nelson was diagnosed with gout in his toe. The gout caused flare-ups and Nelson intermittently sought treatment for the condition.

- In January 2013, Nelson suffered an ankle injury at work and an MRI revealed a ligament tear and underlying degeneration.

- In August 2013, Nelson had a left knee x-ray performed that showed arthritis.

- In June 2014, Nelson underwent left knee arthroscopic surgery after an alleged work injury, although the treating physician questioned whether the condition arose at work.

C. **Work history and vocational expert opinions**

In 1997, Nelson began working as a car salesman. Other than a short period selling cleaning supplies, Nelson continued working as a car salesman in different capacities at various car dealerships and sales lots until the March 29, 2018, injury. Nelson had been working for Dependable Auto Sales as a car salesman and sales manager for more than one year prior to his March 2018 back injury.

Nelson returned to light-duty work for Dependable Auto Sales for a short period after his injury but did not return to work after May 2018. Nelson consulted with the Industrial Commission Rehabilitation Division's vocational consultants in May 2018. In early 2019, Nelson confirmed

with a vocational consultant that he was receiving Social Security Disability benefits and did not intend to return to work.

In October 2018, Nelson underwent a functional capacity evaluation ("FCE"). To measure Nelson's sincerity of effort, the evaluator used several indicators that the evaluator concluded indicated good effort during the evaluation. The FCE results placed Nelson in the "Light Physical Demand Classification of Worker," and the evaluator stated that Nelson's lifting restrictions and poor fitness test results meant that Nelson required frequent breaks, needed to change postures regularly, and would have trouble tolerating sustained work.

In December 2020, Vocational Consultant Kent Granat authored a vocational assessment for Nelson, which included a labor market access analysis. Granat concluded that Nelson was totally and permanently disabled based on a combination of medical and nonmedical factors. Granat's labor market access analysis did not include managerial jobs because, as Granat explained in an addendum to his report, Nelson told him he had not previously worked in a managerial position.

In July 2021, Vocational Consultant Cali Eby authored a vocational assessment, which included a labor market access analysis based on the medical opinions and restrictions from various doctors. Using Dr. Chong's medical opinion, Eby concluded that Nelson suffered no PPI and had no restrictions as a result of the March 29, 2018, injury. Using Dr. Blair's medical opinion, Eby concluded that Nelson suffered a 65% loss of access to the labor market. Using the restrictions identified in the FCE, Eby concluded that Nelson suffered a 70% loss of access to the labor market. Eby opined that Nelson was not totally and permanently disabled because, even under the most stringent restrictions, there was a labor market for Nelson.

Granat authored an addendum in response to Eby's vocational assessment. Granat concluded that any search Nelson may conduct for suitable employment would be futile given his restrictions. Therefore, Granat classified Nelson an odd-lot worker.

**D. Procedural history**

Nelson filed a worker's compensation claim against his employer and his employer's surety on April 11, 2018. Nelson settled that claim in September 2019. Nelson then filed a claim against the ISIF for total and permanent disability benefits on March 30, 2020. Nelson's claim against the ISIF proceeded to a hearing before a Commission referee. During his testimony at the hearing, Nelson admitted that in 1996, he was charged with felony insurance fraud in connection

with a worker's compensation claim for which he received benefits. Nelson pleaded guilty to a misdemeanor and was placed on probation until he repaid the worker's compensation benefits.

Following the hearing, the referee issued written findings of fact, conclusions of law, and a recommendation denying Nelson's claim. At the outset of his analysis, the referee found that Nelson was not a credible witness. The referee based his credibility determination on Nelson's subjective reports regarding his injuries, which the referee found had varied over time. The referee also found that Nelson provided inconsistent testimony on several other issues and was previously convicted of insurance fraud related to a claim for worker's compensation benefits.

Because the referee found that Nelson was not credible, the referee assigned greater weight to objective medical evidence, such as Dr. Chong's medical opinion and Eby's vocational analysis. The referee accorded less weight to evidence that depended on Nelson's subjective reporting, such as Dr. Blair's medical opinion and Granat's vocational analysis. The referee ultimately recommended that Nelson failed to demonstrate that he was totally and permanently disabled under either the 100% or odd-lot methods. The referee also recommended that Nelson failed to demonstrate that he suffered a permanent impairment as a result of the March 2018 accident. The Commission adopted the referee's recommendations in their entirety and denied Nelson's claim. Nelson timely appealed.

## II.    STANDARD OF REVIEW

"When reviewing a decision of the Industrial Commission, this Court exercises free review over questions of law, but reviews questions of fact only to determine whether substantial and competent evidence supports the Commission's findings." *Sharp v. Thomas Bros. Plumbing*, 170 Idaho 343, 348, 510 P.3d 1136, 1141 (2022) (quoting *Tenny v. Loomis Armored US, LLC*, 168 Idaho 870, 877, 489 P.3d 457, 464 (2021)). "Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Oliveros v. Rule Steel Tanks, Inc.*, 165 Idaho 53, 57, 438 P.3d 291, 295 (2019) (quoting *Mazzone v. Tex. Roadhouse, Inc.*, 154 Idaho 750, 755, 302 P.3d 718, 723 (2013)). "It is more than a scintilla of proof, but less than a preponderance." *Sharp*, 170 Idaho at 348, 510 P.3d at 1141 (citation omitted). "All facts and inferences will be viewed in the light most favorable to the party who prevailed before the Industrial Commission." *Id.* (citation omitted). "Whether a claimant has an impairment and the degree of permanent disability resulting from an industrial injury are questions of fact." *Oliveros*, 165 Idaho at 58, 438 P.3d at 296 (citation omitted).

### III. ANALYSIS

The thrust of Nelson's argument on appeal is that the Commission erred in finding that he was not credible, which unduly influenced the Commission's ultimate findings that Nelson (1) was not totally and permanently disabled, and (2) did not suffer a permanent impairment as a result of the March 2018 accident.

A claimant can recover total and permanent disability benefits from the ISIF when the employee has a preexisting permanent impairment that combines with a work-related injury to cause total and permanent disability. I.C. § 72-332(1). Four elements must be proven in order to recover against the ISIF under this section:

> (1) the claimant suffered from a preexisting impairment;
>
> (2) the preexisting impairment was manifest;
>
> (3) the preexisting impairment was a subjective hindrance to employment; and
>
> (4) the combined effects of the preexisting impairment and the subsequent injury resulted in total and permanent disability or the subsequent injury aggravated and accelerated the preexisting impairment to cause total and permanent disability.

*Aguilar v. Indus. Special Indem. Fund*, 164 Idaho 893, 902, 436 P.3d 1242, 1251 (2019) (citing I.C. § 72-332).

In this case, the Commission found that Nelson could not satisfy this test for two reasons: (1) Nelson failed to prove that he was totally and permanently disabled, and (2) he failed to prove that he suffered a permanent impairment as a result of the March 2018 accident. Nelson's appeal challenges these findings and requires us to examine the definition of "total and permanent disability."

Total and permanent disability occurs "when the actual or presumed ability to engage in gainful activity is reduced or absent because of permanent impairment and no fundamental or marked change in the future can be reasonably expected." I.C. § 72-423. "In determining whether a claimant is permanently disabled, both medical and nonmedical factors are considered." *Boley v. State, Indus. Special Indem. Fund*, 130 Idaho 278, 280, 939 P.2d 854, 856 (1997) (citing I.C. § 72-425). "Nonmedical factors broadly include circumstances that impair a claimant's ability to compete in the labor market[.]" *Sharp v. Thomas Bros. Plumbing*, 170 Idaho 343, 348, 510 P.3d 1136, 1141 (2022) (citation omitted); *see also* I.C. § 72-430 (listing nonmedical factors).

"There are two methods by which a claimant may establish a permanent disability." *Boley*, 130 Idaho at 281, 939 P.2d at 857. "A claimant can establish total, permanent disability by showing

7

'his or her medical impairment together with the nonmedical factors total 100%' disability, or by showing that he or she 'fits within the definition of an odd-lot worker.'" *Aguilar*, 164 Idaho at 900, 436 P.3d at 1249 (quoting *Boley*, 130 Idaho at 281, 939 P.2d at 857). Under the 100% method, "[i]f the Commission finds that a claimant has met his or her burden of proving 100% disability via the claimant's medical impairment and pertinent nonmedical factors, there is no need for the Commission to continue." *Boley*, 130 Idaho at 281, 939 P.2d at 857. "The odd-lot doctrine comes into play when the claimant has proved something less than 100% disability." *Id.* (citation omitted). "An odd-lot worker is one who, as a result of the injury, is impaired to an extent that his or her ability to perform services is so limited in quality, quantity, or dependability that no reasonable market for his or her services exists." *Aguilar*, 164 Idaho at 900, 436 P.3d at 1249 (citation omitted). Thus, "[a]ccess to a labor market is central to either method of demonstrating that a claimant is totally and permanently disabled." *Brown v. Home Depot*, 152 Idaho 605, 608, 272 P.3d 577, 580 (2012).

The Commission found that Nelson was not totally and permanently disabled under either the 100% or odd-lot methods. The Commission began its analysis of Nelson's claim by evaluating his credibility and finding that he was not a credible witness. Relevant here, the Commission's credibility determination was based on three of the Commission's other findings: (1) that Nelson exerted insincere effort during his FCE, (2) that Nelson testified inconsistently on four topics, and (3) that Nelson was previously convicted of misdemeanor insurance fraud. Because the Commission found that Nelson was not credible, it assigned "greater weight" to objective medical information not dependent upon Nelson's subjective representations. For example, while the Commission assigned greater weight to Dr. Chong's opinion because it did not rely on Nelson's representations, it afforded less weight to Dr. Blair's opinion and the FCE results because they did rely on Nelson's subjective reports.

In its total and permanent disability analysis, the Commission also considered two competing vocational expert reports. Granat concluded that Nelson suffered a 99.3% loss of access to the labor market, which rendered Nelson an odd-lot worker. However, Eby concluded that Nelson suffered between 0% and 70% loss of access to the labor market depending on which set of medical restrictions were used. As a result, Eby concluded that Nelson was not an odd-lot worker. The Commission found that "Granat assigned significant weight to [Nelson's] subjective recitation of what he could and could not do, rather than the medical opinions defining

8

restrictions." Accordingly, the Commission assigned more weight to Eby's analysis and concluded that it was more persuasive. The Commission found that Nelson had failed to demonstrate that he was totally and permanently disabled because, even under the most restrictive limitations imposed by Nelson's FCE, Eby was able to identify a labor market for Nelson.

**A. Although the Commission erred in several of its credibility findings, the remainder of its credibility findings are supported by substantial and competent evidence and are sufficient to support its ultimate finding that Nelson was not a credible witness.**

The Commission made several findings that Nelson was not credible on specific issues, which it in turn relied on to find that Nelson was not a credible witness. Specifically, it cited its findings that (1) Nelson did not provide genuine effort at his FCE; (2) Nelson testified inconsistently regarding his preexisting injuries; (3) Nelson testified inconsistently regarding the arthritic condition in his back; (4) Nelson testified inconsistently regarding his prior management experience; (5) Nelson's testimony regarding his return to work conflicted with the record; and (6) Nelson was previously convicted of misdemeanor insurance fraud. Nelson argues that the findings concerning the FCE and his prior testimony were not supported by substantial and competent evidence and that the Commission erred by relying on his misdemeanor conviction for insurance fraud.

While we agree with Nelson that some of the Commission's findings underlying its credibility determination were not supported by substantial and competent evidence, other findings were supported by substantial and competent evidence. Because the Commission's overall credibility determination was based on some valid findings, we affirm the Commission's decision that Nelson was not totally and permanently disabled and do not address the Commission's alternative finding that Nelson did not suffer a permanent impairment as a result of the March 2018 accident.

*1. The Commission's finding regarding Nelson's effort on the FCE is not supported by substantial and competent evidence.*

Although the Commission did not explicitly find that Nelson failed to give a genuine effort during his FCE, the Commission found that Nelson "met the validity testing for giving at least minimal effort" and that Nelson "retained a measure of subjective control and reporting" during the evaluation. Nelson argues that the Commission's finding misrepresented his effort on the FCE and that the Commission then used that to undermine his credibility. He asserts that the FCE results

9

indicate he gave "good effort," so the Commission's suggestion that he gave minimal effort is clearly erroneous.

Nelson's FCE report explains that, to ensure valid results, "each test is evaluated by computerized calculation of Coefficient of Variation (CV)" and that measuring variation ensures that the examinee is putting forth consistent, sincere effort. Nelson's report indicates that the FCE examiner employed several validity testing methods, all of which indicated that Nelson's FCE results were valid. According to the examiner, validity testing indicated that Nelson put forth a "good effort."

The Commission's suggestion that Nelson gave minimal effort conflicts with the express language of the FCE report. The FCE examiner concluded that Nelson exerted "good effort." Accordingly, the Commission's factual finding implicating that Nelson did not provide a genuine effort is not supported by substantial and competent evidence.

The Commission's unsupported factual finding impacted the weight it assigned to Nelson's FCE results. Although Nelson's test results indicated he gave a good effort, the Commission discounted the results of his FCE, which placed Nelson in the "Light Physical Demand Classification of Worker," and indicated that Nelson required frequent breaks, needed to change postures regularly, and would have trouble tolerating sustained work.

2. *The Commission's findings that Nelson testified inconsistently regarding his preexisting injuries are not supported by substantial and competent evidence.*

The Commission also found that Nelson testified inconsistently at a 2019 deposition, a 2020 deposition, and the hearing before the referee regarding his preexisting injuries. The Commission found that, at a 2020 deposition, Nelson gave significantly more detail about how his injuries impacted his ability to work and that he was "attempting to shade the impressions he gave about his pre-existing conditions depending upon which party was deposing him." The Commission also found that the 2020 deposition was the first time that Nelson testified that he missed work due to his preexisting injuries. The Commission found that Nelson provided conflicting testimony in his 2020 deposition because he testified that his preexisting injuries caused him to miss work, and then later in that same deposition testified that he could do "everything" at work with his preexisting injuries. Further, the Commission found that, at the hearing before the referee, Nelson "described missing work to a much greater extent than he had in depositions." The Commission also found that Nelson's testimony at the hearing that his prior employers made

10

accommodations was inconsistent with his 2019 deposition testimony. We agree with Nelson that these findings are not supported by substantial and competent evidence.

Our review of Nelson's 2019 and 2020 depositions does not reveal any significant differences in Nelson's testimony regarding his preexisting injuries. Nelson testified in his 2019 deposition that injuries to his knees, ankle, and shoulder impacted his work prior to his back injury, so the Commission's finding that Nelson was "attempting to shade the impressions he gave about his pre-existing conditions depending upon which party was deposing him" is not supported by substantial and competent evidence. Although the Commission correctly found that Nelson "for the first time" testified in his 2020 deposition that he missed work due to his preexisting injuries, Nelson was not asked in his 2019 deposition whether his prior injuries had caused him to miss work. Accordingly, there is no substantial and competent evidence in the record to support the Commission's finding that Nelson provided inconsistent testimony regarding his preexisting injuries between his 2019 and 2020 depositions.

Regarding Nelson's purportedly conflicting 2020 deposition testimony, Nelson testified that he missed work occasionally due to his ankle and knee problems. The Commission found that testimony was inconsistent with Nelson's later testimony in that same deposition that he could do "everything" prior to his back injury. In other words, the Commission took Nelson's testimony that he could do "everything" prior to his back injury to mean that his preexisting injuries did not impact his work. Although it is true that Nelson testified in his 2020 deposition that he missed work occasionally due to his ankle or knees, in that same discussion Nelson also stated that he would be working full time if it were not for his back injury. Therefore, Nelson's testimony that he could do "everything," when considered in context, meant that he could perform his job duties prior to his back injury even if he missed work occasionally due to his ankle and knee problems. Therefore, the Commission's finding that Nelson provided inconsistent testimony in his 2020 deposition is not supported by substantial and competent evidence.

Finally, Nelson's testimony at both of his depositions was not materially inconsistent with his testimony at the hearing. The Commission found that, at the hearing, Nelson "described missing work to a much greater extent than he had in depositions." The Commission also found that Nelson testified at the hearing that employers made accommodations to help him work prior to his back injury, which was shown on cross-examination to be inconsistent with his 2019

deposition testimony. We have reviewed Nelson's hearing testimony and his 2019 deposition testimony and are unable to identify any material inconsistencies between the two.

Nelson testified in 2019 that he was "currently entirely unable to work" and that it was "not necessarily" due to his knees and ankle because he was able to work prior to his back injury. At the hearing, Nelson also testified that he was unable to return to work "not necessarily" just because of his back injury. It is true that Nelson's hearing testimony focused more on his knees and ankle, but he explained at multiple junctures that his ankle and knee pain "progressively got worse over the years." Both explanations are consistent with Nelson's 2020 deposition testimony that he would be working if it were not for his back injury. Nelson was not required to produce identical testimony across both depositions and the hearing. *See Clark v. Shari's Mgmt. Corp.*, 155 Idaho 576, 581, 314 P.3d 631, 636 (2013) ("[W]here employees claiming workers' compensation have proffered consistent—though not identical—testimonies, this Court has held that they have substantive credibility."). Because we conclude that Nelson's testimony, though not identical, was consistent between his two depositions and his hearing testimony, the Commission's finding that Nelson testified inconsistently regarding his prior injuries is not supported by substantial and competent evidence.

3. *The Commission's finding that Nelson testified inconsistently regarding the arthritic condition in his back is not supported by substantial and competent evidence.*

The Commission found that Nelson "waffled" about whether he had back problems prior to his March 29, 2018, injury and "redirected" questions he was asked in his 2019 deposition regarding arthritic symptoms "by answering whether he had been told he had arthritis in his back." The Commission appears to be referring to the following colloquy:

> Q. So you have this injury March 29th, 2018, a month later April 25th, 2018 they do an MRI which shows essentially bone spurs in your low back. You never had back problems previous?
>
> A. I never had any back problems before. Nobody has ever told me that it was bone spurs, though.
>
> Q. Well, that's what the MRI showed. It also showed spondylosis.
>
> A. Yeah, that's what they told me. I don't know what that is.
>
> Q. It's stenosis, which is essentially it's an arthritic condition of your back. Have you ever had any arthritic condition?
>
> A. I mean, I have them in my knees I know that. My ankle.
>
> Q. But no arthritic condition of your back?

A. No, not that I was ever told until this.

Contrary to the Commission's finding, Nelson answered each of the questions he was asked and did not "waffle" in his responses. Instead, he answered that he had not been informed of an arthritic condition in his back until the hearing. Therefore, we hold that the Commission's finding that Nelson testified inconsistently on his arthritic back condition is not supported by substantial and competent evidence.

4. *The Commission's finding that Nelson was not credible in his testimony concerning his prior management experience is supported by substantial and competent evidence.*

The Commission also found that Nelson provided inconsistent testimony at his two depositions and before the referee regarding his management experience. Nelson argues that his testimony in all three instances was consistent and that most of the time he did not supervise other people.

Our review of the record indicates that the Commission's finding is supported by substantial and consistent evidence. In his 2019 deposition, Nelson testified that he had "management skills":

Q. So you've had management skills, it sounds like?

A. Yes, sir.

Q. What are those?

A. Just pretty much a sales' [sic] manager for a car lot.

Q. You did that at Dependable [Auto Sales]; is that right?

A. Yes.

Q. Where else?

A. Competition Auto.

Q. Where else?

A. Wackerli I was the closing manager.

Q. What's the difference between being a car lot manager and a closing manager?

A. A car lot manager you do everything. I mean, you run the store basically. And a closing manager you just talk to the customers after another salesman has talked to them and you close them on the sale, work the payments, and so forth.

Q. So you did more of the financial side?

A. Yes.

Q. Okay. What other sort of management skills have you done?

13

A. That's pretty much it.

At his 2020 deposition, Nelson testified that he performed managerial functions, like hiring employees, managing employees, and making business decisions:

Q. And what was your title [at Dependable Auto Sales]?

A. Sales manager.

Q. Okay. Did you have salespersons that you supervised?

A. I had one.

Q. Just one?

A. Yeah. I had two at one time; but mostly one.

Q. And they were just entry level salespersons?

A. Right.

Q. Kind of learning the business maybe?

A. Sure.

Q. And as sales manager for Dependable, anything different in terms of your work week or your duties of anything you've done before?

A. Nope. I mean, I was in charge of everything.

Q. What do you mean "in charge of everything"?

A. Financing, paying bills, lot -- getting the lot taken care of. Everything.

Q. Okay.

A. If I needed to hire somebody to come in and do something, he would let me go ahead and tell them to -- you know, hire them and tell him and…

Q. "He" being the owner?

A. Yes.

Q. Likness?

A. Yes.

Q. So, basically --

A. It was basically my store, but he would come up once a week and check on me and stuff like that.

Q. So, Likness was mostly in Pocatello?

A. Uh-huh.

Q. Yes?

A. Yes. Sorry.

Q. So, you're basically running the shop.

14

A. Right.

Q. And you had one salesman?

A. Some of the time. A lot of the times it was just me.

Q. Did you have anyone else working in the office doing bookkeeping or anything?

A. That was in the Pocatello office. I would get the paperwork ready and I'd send it to Pocatello.

Q. Oh, okay. So, basically you're just running the whole thing?

A. Correct.

Despite the above testimony, Nelson later testified before the referee that he was not truly a manager because Dependable Auto Sales and Competition Auto were one-man operations. A similar explanation was given to Granat, who then performed a labor market analysis that excluded managerial positions because Granat felt Nelson did not have actual managerial experience. Nelson's testimony at the hearing and his statements to Granat were inconsistent with his deposition testimony in 2019 and 2020, where he testified that he did have managerial experience. Therefore, we conclude that the Commission's finding that Nelson provided inconsistent testimony regarding his management experience is supported by substantial and competent evidence.

5.  *The Commission's finding that Nelson was not credible in his testimony concerning his return to work after the March 2018 injury is supported by substantial and competent evidence.*

The Commission also found that Nelson's testimony that he could not to return to work after he became medically stable and was released to full duty conflicted with other evidence in the record that his employer had indicated that Nelson could return to work:

> [Nelson] testified that he attempted to return to work unsuccessfully and that Employer sent a letter to the Commission stating he was unable to work. That document is not in the record. When asked about it he said it was "on my phone out in the car." It was never produced. The record does show that [Nelson] was released to light-duty work up to four hours per day very early on in his recovery. After a few weeks Dr. Rindfleisch took him off work entirely as a temporary matter during recovery. It does not show that [Nelson] attempted any work after he became medically stable and was released to full duty.

Initially, Nelson argues on appeal that the Commission's finding that Nelson "never returned to work" is unsupported. However, the Commission found that Nelson did not return to work *after he became medically stable*. That finding by the Commission is supported by substantial and

competent evidence because there is no evidence in the record that Nelson returned to work after Dr. Chong declared him medically stable in August 2018 or after Dr. Blair declared him medically stable in January 2019.

At the hearing, Nelson testified that he returned to work for about a month following his injury when his employer sent a letter to the Commission stating that Nelson could no longer perform his work duties. Nelson concedes that he did not offer the letter into evidence. Nelson's testimony conflicts with notes from a vocational consultant from the Commission's Rehabilitation Division, which indicate that Nelson's employer stated that Nelson could return to work within his restrictions. There is nothing in the record suggesting that Nelson's employer later changed its position. Accordingly, the Commission's finding that Nelson's testimony conflicted with other evidence in the record is supported by substantial and competent evidence.

6. *The Commission did not err in considering Nelson's conviction for misdemeanor insurance fraud in determining his credibility.*

In reaching its ultimate determination that Nelson was not a credible witness, the Commission relied in part on Nelson's 1996 conviction for misdemeanor insurance fraud. Nelson does not dispute that he was convicted of insurance fraud. Instead, Nelson argues that the Commission should have ignored his insurance fraud conviction because it is irrelevant and inadmissible. Nelson relies on Idaho Rule of Evidence 609 to support his position that a misdemeanor conviction is not admissible to impeach credibility.

Nelson's reliance on Idaho Rule of Evidence 609 is unpersuasive. "Strict adherence to the rules of evidence *is not* required in Industrial Commission proceedings and admission of evidence in such proceedings is more relaxed." *Stolle v. Bennett*, 144 Idaho 44, 49–50, 156 P.3d 545, 550–51 (2007) (quoting *Hagler v. Micron Tech., Inc.*, 118 Idaho 596, 598, 798 P.2d 55, 57 (1990)). Idaho Code section 67-5251(1) provides that, in proceedings before the Commission, "evidence may be admitted if it is of a type commonly relied upon by prudent persons in the conduct of their affairs." "The legislature intended the [I]ndustrial [C]ommission to have the 'discretionary power to consider any type of reliable, trustworthy evidence having probative value . . . even though that evidence may not be admissible in a court of law.'" *Mazzone v. Tex. Roadhouse, Inc.*, 154 Idaho 750, 758, 302 P.3d 718, 726 (2013) (citation omitted). Thus, the Commission was not required to strictly comply with the Idaho Rules of Evidence.

Nelson frames his relevance argument as a question of law—whether the Commission erred in admitting his conviction because it does not meet the relevance requirements in Idaho

Rules of Evidence 401 and 402. However, as previously noted, the Commission is not required to strictly comply with the Rules of Evidence. Instead, the pertinent issue is whether the Commission erred in relying on the conviction to make its factual finding that Nelson was not credible. We review the Commission's factual findings for substantial and competent evidence. *Sharp v. Thomas Bros. Plumbing*, 170 Idaho 343, 348, 510 P.3d 1136, 1141 (2022) (quoting *Tenny v. Loomis Armored US, LLC*, 168 Idaho 870, 877, 489 P.3d 457, 464 (2021)). Accordingly, we must determine whether Nelson's conviction was substantial and competent evidence supporting the Commission's finding that Nelson was not credible.

Nelson pleaded guilty to misdemeanor insurance fraud in 1996. Nelson places much emphasis on the age of the conviction when arguing it is not relevant to his credibility in this proceeding. While a significant amount of time has elapsed since his conviction, the conviction does go to the very heart of this matter since it establishes Nelson previously lied in order to obtain worker's compensation benefits. While a significant amount of time has passed since his prior conviction, this circumstance presents a similar scenario where Nelson is once again seeking worker's compensation benefits. The passage of time since the conviction does not entirely eliminate the relevance of Nelson's prior conduct when judging his credibility in this worker's compensation proceeding. Therefore, we conclude that Nelson's prior misdemeanor conviction for insurance fraud is at least minimally probative of Nelson's credibility in this action.

Critically, however, Nelson's conviction for insurance fraud was not the only remaining evidence supporting the Commission's finding that Nelson was not credible. As noted above, the Commission's credibility determination was also supported by its findings that Nelson provided inconsistent testimony regarding his management experience and that Nelson testified inconsistently with the record regarding his ability to return to work after he became medically stable and was released to full duty. Taken together, these three factual findings constitute substantial and competent evidence supporting the Commission's finding that Nelson was not a credible witness. *See Oliveros v. Rule Steel Tanks, Inc.*, 165 Idaho 53, 57, 438 P.3d 291, 295 (2019) ("Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." (citation omitted)).

In summary, while we agree with Nelson that some of the Commission's credibility findings were not supported by substantial and competent evidence, the Commission did not base its credibility determination exclusively on those unsupported findings. We are bound to uphold

the Commission's factual finding concerning Nelson's credibility if that finding is supported by substantial and competent evidence. Having excluded the unsupported findings, we conclude that the Commission's remaining, supported findings provide substantial and competent evidence to uphold the Commission's credibility determination.

7. *The Commission did not err in finding that Nelson was not totally and permanently disabled.*

Having addressed Nelson's arguments attacking the Commission's credibility determination, we return to the Commission's finding that Nelson is not totally and permanently disabled. Whether a claimant is totally and permanently disabled is a question of fact for the Commission. *Oliveros*, 165 Idaho at 58, 438 P.3d at 296 (citation omitted). Nelson's arguments on appeal focused exclusively on the Commission's finding regarding Nelson's credibility. Nelson has not offered any other arguments attacking the Commission's finding regarding total and permanent disability. This finding was predicated on more than just credibility. There was substantial and credible evidence in the record that, although contested, supported the Commission's finding. Because the Commission's credibility determination is also supported by substantial and competent evidence, we find no error in the Commission's evaluation of the evidence concerning total and permanent disability. Therefore we affirm the Commission's finding that Nelson is not totally and permanently disabled and do not address the Commission's alternative finding that Nelson failed to establish that he suffered a permanent impairment as a result of his work-related accident.

## IV.   CONCLUSION

For the foregoing reasons, we affirm the Commission's order.

Chief Justice BEVAN, and Justices BRODY, MOELLER, and MEYER CONCUR.